**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO. 5:11-CV-189-DCK**

| | |
|---|---|
| **JOYCE JUDY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **ORDER** |
| ) | |
| **ROBERT E. SCHACHT,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER IS BEFORE THE COURT** on the "Motion For Partial Summary Judgment On Part Of Her Claim For Conversion By Joyce Judy" (Document No. 35); Defendant's "Motion For Summary Judgment And Partial Summary Judgment" (Document No. 37); and the "Motion For Partial Summary Judgment On Schacht's Defenses Of Illegality And Lack Of Consideration By Joyce Judy" (Document No. 40). The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and these motions are now ripe for disposition. Having carefully considered the motions, the record, and applicable authority, the undersigned will grant Defendant's motion as to Plaintiff's claims, and otherwise deny the pending motions.

## I.     BACKGROUND

### A. Facts

1. The Players

Joyce Judy ("Plaintiff" or "Judy") worked as the president of the Arkansas Employees Federal Credit Union ("the Credit Union") from February 2006 until April 2011. See (Document No. 37-1, p.1) (citing Document No. 37-2, pp.3-4). Judy managed at least a dozen employees

and three supervisors; and her duties also included managing the investment portfolio of the Credit Union and determining in part where funds were invested. <u>Id.</u> Judy had one year of college at Arkansas State University; "had an additional four or five classes in accounting and training with Farm Bureau Insurance;" and was "in finance for 30 years." (Document No. 37-2, pp.7-8).

Robert "Bob" E. Schacht ("Defendant" or "Schacht") attended high school through the eleventh grade and never obtained his GED. (Document No. 37-1, p.1) (citing Document No. 43-1, p.7). Schacht is employed by and owns Bob Schacht Motor Sports, which focuses on working with younger drivers looking for experience to lead them into NASCAR racing. <u>Id.</u> Schacht also owns Chapin Motorsports, LLC. (Document No. 43-1, p.8).

Schacht got to know Charles "Chuck" L. Walker ("Walker") beginning in or about 2000, as a customer of Bob Schacht Motor Sports. (Document No. 43-1, pp.10-11; Document No. 37-4, p.9). Schacht testified that Walker "always talked about this platform trading stuff, which I don't know nothing about, but, you know, talked about how people put money in and get these big returns and stuff like that out of them." <u>Id.</u> Judy met Walker in or about October 2007, at a restaurant in the Dallas-Fort Worth airport. (Document No. 43, p.1) (citing Document No. 37-2, p.20); <u>see also</u> (Document No. 37-4, p.6). Judy and Walker stayed in contact, exchanging occasional emails and phone calls. <u>Id.</u>

Walker introduced Judy and Schacht. (Document No. 37-2, p.4; Document No. 37-4, p.11; Document No. 43-1, p.10). Walker testified that he introduced them "[b]ecause we were looking to buy a racetrack." (Document No. 37-4, p.11); <u>see also</u> (Document No. 37-2, p.4). Schacht had mentioned to Walker that the Iowa Speedway "could be for sale and then he

[Walker] took it to the next step and flew out to Iowa." (Document No. 43, p.2) (citing Document No. 43-1, pp.32-33); see also (Document No. 43-1, p.10).

2. The Deal

At some point, Walker proposed that funds for purchase of the Iowa racetrack could be raised by investing with Emlyn Mousely ("Mousely") from the United Kingdom. (Document No. 43-1, p.10). Walker testified, however, that he had never previously done any transactions with Mousely. (Document No. 37-4, p.12). Schacht first heard about Mousely through Walker, who described how successful Mousely had been with "this platform trading stuff." (Document No. 43-1, p.15). Schacht never met Mousely. Id.; (Document No. 43-1, p.16).

Schacht described the investment opportunity as follows:

> So the way that I understand it is that you get some money, a
> million dollars, five million dollars, whatever exactly, and you
> pool it with other people, they come up with 100 million dollars or
> whatever platform they're trying to get you on, and then they
> invest that money. And then in 30 days, you're supposed to get
> these big returns on your money.

(Document No. 43-1, p.16). Walker testified that Mousely said they "could put this money into a trade platform and over the course of 12 months or further create the funds to purchase the racetrack." (Document No. 37-4, p.12). Walker expected a $1 million investment would return between $30 million and $43 million. Id. Apparently, Schacht expected a return of $50 million by early 2010. (Document No. 43-1, p.83).

Judy flew to Charlotte, North Carolina on or about September 25, 2009 to discuss the proposed transaction and racetrack purchase. (Document No. 37-2, p.7, 9; Document No. 37-4, p.13; Document No. 43-4, p.101). Schacht, Walker, and Judy had a "probably quite lengthy" phone call with Mousely, and then had a lunch where they "discussed everything we could

possibly think of with questions ourselves, among ourselves." (Document No. 37-4, p.13). Judy contends that Schacht and Walker told her that she "need only deposit money in an account, and the trader would 'ping' the account to verify the presence of the money" and the "money would never leave the account." (Document No. 43, pp.2-3) (citing Document No. 37-2, p.9; Document No. 37-4, p.15); see also (Document No. 37-2, p.7).

Judy testified that Schacht and Walker told her that their joint venture must include the word "sponsorship" because the investment "wasn't for a loan; it had to be a sponsorship of some sort." (Document No. 37-2, p.6). Walker explained in his deposition that

> The way the deal was originally structured with the transaction was project based, that was – the project was the racetrack. The incoming funds to Bob Schacht Motorsports came in the form of sponsorship from the bank. So that would give us use of the money for the transaction.

(Document No. 37-4, p.14).

According to Judy, "[i]n anticipation of a deal, Walker prepared a contract to be entered between one of Schacht's companies, Chapin Motorsports, and Judy's employer, the Arkansas Federal Credit Union." (Document No. 43, p.2) (citing Document No. 37-4, p.14; Document No. 43-1, pp.110-111; Document No. 43-2). Walker testified that he drafted the agreement without the assistance of any attorneys or other professionals. (Document No. 37-4, p.14). An email from Judy, apparently to Schacht, dated September 29, 2009, states in pertinent part: "Here is your Credit Union account …. The new papers have been mailed. My lawyer is looking over the JV for me." (Document No. 43-4, p.35).

   3. The Agreement(s)

The "Joint Venture Agreement" (Document No. 43-2) was executed on October 2, 2009, by Judy for the Credit Union and by Schacht for Chapin Motorsports, LLC. The "Joint Venture

Agreement" stated that the Investor (the Credit Union) would allocate "sponsorship funds in the amount of Five Million and No/100 ($5,000,000.00) Dollars for use in the Facilitator's [Chapin Motorsports] private placement trading platform." (Document No. 43-2, p.1). Judy later testified that she believed this was the final written agreement between the parties. (Document No. 37-2, pp.8-9). On or about October 5, 2009, Judy "[a]s President/CEO of Arkansas Employees Credit Union, with full Credit Union responsibility and legal authority," executed a letter to Schacht verifying a Credit Union account for Chapin Motorsport, LLC with $5,000,000.00. (Document No. 43-5); see also (Document No. 43-1, pp.112-113).

During her deposition, Judy testified that she never discussed the sponsorship agreement with the Credit Union's board of directors, and admitted that she did not have the authority to sign the Joint Venture Agreement on behalf of the Credit Union without first discussing it with them. (Document No. 37-2, p.7).

Schacht's deposition includes the following testimony:

A. The - - see, the money that was in the – the money that was in the Arkansas Federal Credit Union, that account there - - I don't know what's the word that was used, maybe doctored up paper to make it look like there was money in an account.

I mean, there was no money in the account. It was an account with my name on it, but she controlled the paper on it – Joyce. So it showed there was five million in the account.

So then when that didn't work, then the conversations with Emlyn that we couldn't have that much money and this, that and the other thing, that's when Emlyn said, "Well, if you could get a million dollars and put it in the account, then we should be able to ping it, and I'll try to get you on a smaller platform group or whatever["]. I'm not sure.

(Document No. 43-1, pp.38-39);  <u>see also</u> (Document No. 43-1, p.112) ("[T]hey couldn't ping the credit union, so this didn't work . . . [t]hat's when it was talked about moving the million dollars into Bank of America.").

Although Judy attaches the "Joint Venture Agreement" (Document No. 43-2), and the Schacht Letter (Document No. 43-5) confirming a $5,000,000.00 account to her "Response In Opposition To Schacht's Motion…" (Document No. 43), she now contends in her "Response …" that after receiving the "draft" agreement, she told Schacht and Walker "she could not get her employer to invest." (Document No. 43, p.2) (citing Document No. 37-2, p.9). Judy testified that when she told Schacht and Walker she could not raise five million, they told her "they could still accomplish what we wanted to accomplish, buying the Iowa Motor Speedway, with 1 million." (Document No. 37-2, p.9). She further testified that she did not recall any modifications or changes to the Joint Venture Agreement, other than the change from $5 million to $1 million. (Document No. 37-2, pp.9-10).

On or about October 26, 2009, Schacht opened a joint checking account for himself and Judy with Bank of America. (Document No. 23, pp.2-3;  Document No. 43, p.4;  Document No. 43-3). Judy testified that she wanted her name on the account, and that based on her knowledge of banking "[a] joint account means either/or person can withdraw or deposit funds." (Document No. 37-2, p.16). On October 29, 2009, Judy made two transfers of $500,000.00 each into the joint account. (Document No. 23, p.3;  Document No. 43-3, p.3). Judy told Schacht that the million dollars was an investment that she and the Credit Union were willing to make. (Document No. 37-2, p.10).

On the same day as her deposits, Judy had Schacht sign the following statement:

> I, Robert Schacht do hereby acknowledge that the joint account with Joyce M Judy at Bank of America account #237019061256 has an initial deposit into the account of $1,000,000.00 (one million US dollars). I agree this initial deposit was made by Joyce M Judy and Arkansas Employees Federal Credit Union and although this is a joint account, I acknowledge the initial deposit is not my funds to withdraw.

(Document No. 23, p.11; Document No. 43-3, p.1). Judy also told Schacht that "she put an administrative hold on the money" so that the money could not be moved unless she said it was okay; however, she has testified during the course of this litigation that there never was a hold on the account because "there is no such thing as a hold." (Document No. 43-1, p.51; Document No. 37-2, p.44).

Plaintiff Judy has since admitted that **none** of the million dollars came from the Credit Union. (Document No. 37-2, p.9, 14; Document No. 36, p.2). Instead, she raised $500,000 herself (including $225,000 borrowed from a friend), and the other $500,000 came from an individual who was a member of the Credit Union. Id. Judy has also admitted that she "misrepresented an investment to a credit union member and could not replace his money." (Document No. 37-2, p.10); see also (Document No. 36, p.2; ). On or about October 29, 2009, Judy told the member she was "selling him a CD and guaranteed him a rate," but without his (or Schacht's) knowledge deposited the member's $500,000 into the joint Schacht/Judy checking account identified above. (Document No. 23, pp.3-4; Document No. 37-2, pp.10-11; Document No. 43-3, p.3). Based on these events, Judy was later convicted of bank fraud. (Document No. 23, pp.4, 13-18; Document No. 36, p.2).

4. The Wire Transfer

According to Schacht, "Mousely eventually required that the money [in the Bank of America account] actually be wired out of the U.S." (Document No. 37-1, p.3). Schacht

contends that "still believing there to be a hold on the account, [he] called Judy to get her permission to wire transfer the funds to Mousely." Id. (citing Document No. 43-1, pp.41-42). "Judy agreed to 'release the hold' and allow the wire transfer." Id. (citing Document No. 43-1, pp.42,45). Walker describes the transfer as follows:

> **A.** We got a phone call from Emlyn that said they could not ping this account for this particular transaction at BofA.
>
> Q. So deal is off, money goes back to Joyce, the end?
>
> A. No.
>
> Q. Where did I go wrong?
>
> A. So we said, "Okay. So what?"
> And he said, "The money has to move."
> And we said, "You're freaking kidding."
> And he said, "No." So he told us about it.
> We said, "Well, we can't do that. There is no way Joyce is going to allow us to do that."
> He said, "Well, that's the only way I can do it."
> So we hang up. Bob and I are in his office. I pick up my phone and I call Joyce. I take my phone and put it on speaker and I lay it on the desk, because that's how we did all our calls with me and Bob and Joyce. And we tell Joyce, "We just got a phone call from Emlyn, and he said that he could not ping the account, that the money would have to be moved."
> And she said, "Okay." Me and Bob looked at each other and we're like, whoo hoo, we're back in business.
>
> Q. What happened next?
>
> A. Then -- that was on a Wednesday afternoon. And I'll tell you in a minute why I remember that. But that was a Wednesday afternoon, I'm pretty sure. And it was at lunch -- it was right before lunch, because we were getting ready to go to lunch. Bob and I went to the bank, and he made the transfer. We sent the confirmation of the transfer to Emlyn.
>
> And a couple days go by, Emlyn calls us up and says, "Look, we have nothing. No pending account coming into this account." So -- and it was about 4:00 on Friday evening. Bob

called up the bank, because we had expected the bank had sent the money. And the bank hadn't sent the money yet. So Bob raised all kind of hell with the bank, because we had went in two days prior to doing that and we thought that was going to throw the whole transaction off, blah, blah, blah. We looked like -- you know, and so the bank sent it late Friday afternoon. And I just remember it was a Friday afternoon, but we had went to the bank a couple days prior to Friday.

(Document No. 37-4, pp.15-16); see also (Document No. 43-1, pp.42-45, 53-54) ("And she said, 'Okay. Go ahead and move it.'").

According to Judy, "[o]n November 18, 2009, Mr. Schacht wired the entire One Million Dollars out of the Bank of America account" without her permission and thus "wrongfully converted the money." (Document No. 36, p.2). Id.; see also (Document No. 23, pp.4-6; Document No. 37-2, p.32). Judy asserts that she discovered that the million dollars had been wired out of the joint account "a few days after the transfer." (Document No. 37-2, p.17). Judy went on to testify that after she found out about the transfer she made calls to Walker and Schacht, and that she asked Schacht "[w]hat had he done, where's the money." (Document No. 37-2, p.18). Judy stated that Schacht said "[t]hat he had transferred it to Emlyn, that he thought it was okay." Id. She also testified that she spoke to Mousely, and pressed him for answers about "[w]hen was the deal, when was it going through." Id. There is no evidence that Judy instructed Schacht, Mousely, and/or Walker to transfer any of the funds back to the joint account or to the Credit Union.

According to Schacht, he sent an email to Judy confirming the wire transfer. (Document No. 37-1, p.5) (citing Document No. 37-2, p.31). Moreover, Schacht notes that Judy sent him an email on Friday, November 20, 2009 – just two days after the transfer was initiated in which she states – "Sure hope this get there before Wed. We are cutting this so close! Jj." (Document No.

37-1, p.5) (citing Document No. 37-2, p.31; Document No. 43-4, p.90). The subject line for Judy's email shows: "Re: Fwd: Transaction 39336048 Has Been Released." (Document No. 43-4, p.90). Additional emails in this chain, attached as exhibits to Judy's "Response In Opposition…," indicate confirmation that a $1,000,000.00 transfer from Bank of America to "mondiaen capital management N.V." was requested on November 18, 2010, and being processed on November 19, 2010. (Document No. 43-4, pp.91-96). Judy's November 20, 2009 email also shows that it was sent at 11:09 A.M. – apparently, several hours before Schacht called Bank of America to make sure the transaction was going through. (Document No. 43-4, p.90; Document No. 37-4, pp.15-16).

Schacht contends that "Judy had no explanation in her deposition as to how she could reconcile her legal claim against Schacht for an illegal wire transfer with her apparent eagerness for the transaction to move forward as quickly as possible." (Document No. 37-1, p.5) (citing Document No. 37-2, p.31). Judy's deposition specifically provides:

> Q. So your explanation would be that in between the transfer on 11/18 and your email on 11/20 at 11:00 in the morning, that you had both decided to check the account, determined that the money had been wired without your permission, called Chuck, called Bob, missed Bob the first time, got Bob the second time, complained to Bob, and then reconciled yourself to the fact that you sure hope this get there before Wednesday.
>
> **A. Yes**.

(Document No. 37-2, pp.31-32). Later, Judy testified that without telling Schacht or Walker, she went to Bank of America soon after the wire transfer and requested in person that the money be transferred back. (Document No. 37-3, p.6). It does not appear that Judy has any evidence of such a request. Id.

10

Judy further alleges that Schacht attempted to keep the projected profits from the transaction for himself because he set up a separate account in his name only and instructed Mousely to wire the profits there. (Document No. 23, p.5; Document No. 43, p.5). Judy does not assert that any funds were ever wired to the separate Schacht account.

Sometime after the money was wired out of the joint account, Judy told Schacht that she had raised $500,000 of the funds, but she never told him the source of the other $500,000 was from an unknowing investor who was a member of the Credit Union. (Document No. 37-2, p.10).

5. The Missing Million Dollars

"Eventually, Mousely informed the parties that the funds had been stolen from him." (Document No. 37-1, p.5) (citing Document No. 37-2, p.35) ("at some point down the road we found out Emlyn said the money was stolen from him also."). Neither party's briefs provide much of an account of the events following the November 18-20, 2009, wire transfer. However, Judy has attached numerous emails between herself, Schacht, Walker, Mousely, and others, regarding the funds and when she/they should expect some or all funds to be returned. (Document No. 43-4). For the most part, these emails were exchanged in 2010, although a few are dated in 2011 and 2012. Id. Many of the emails from Judy, Schacht, and/or Walker are pleading for, or demanding, answers and/or payments from Mousely, and some suggest ongoing legal action in Europe attempting to recover the missing million dollars. Id.

Judy testified that after the wire transfer she was closely involved ("extremely close") with the venture between Schacht, Walker, and Mousely. (Documents No. 37-2, p.37). At least as late as September 2010, Judy was still planning to get the Iowa racetrack with Schacht.

(Document No. 37-2, p.41). And, as late as April 27, 2011, Schacht and Judy appeared to still be working together to recover the lost funds. (Document No. 43-4, p.7).

## B. Legal Procedure

On December 14, 2011, Plaintiff Joyce Judy, "[h]aving obtained funds that were in the custody of a federally insured banking institution in furtherance of a scheme to defraud a customer," was convicted of bank fraud. (Document No. 23, pp. 4, 13-18); see also, U.S. v. Joyce Judy, 4:11-CR-143-JLH (E.D.Ark. Dec. 14, 2011). Judy was sentenced to a twenty-six month term of imprisonment, and three years of supervised release. Id. Judy acknowledges that despite an FBI investigation into the wire transfer transaction, Schacht was not charged with any wrongdoing, and the Credit Union never pursued any claims against him. (Document No. 37-3, p.3).

On December 29, 2011, a couple of weeks after her conviction, and more than two (2) years after the wire transfer of one million dollars by Schacht, Judy initiated this action with the filing of her original "Complaint" (Document No. 2) against Schacht. Schacht testified that "everybody was happy" after the wire transfer, and that he first realized Judy was upset with him and/or accused him of taking the money without her permission, when the Complaint was filed. (Document No. 43-1, pp.152-154). The only emails/evidence submitted by Judy suggesting she blamed Schacht for the loss of the million dollars are dated in or about January and February 2012, *after* the lawsuit was filed. (Document No. 43-4, pp.1-4).

Even after her guilty plea and conviction, Judy emailed Schacht on January 25, 2012 – "Do you honestly think I deserve what I got? **I am the only one who did absolutely nothing wrong**." (Document No. 43-4, p.4) (emphasis added). A February 7, 2012 email indicates that Judy was still hoping and praying for some sort of deal or return from Mousely and Walker.

12

(Document No. 43-4, p.1); <u>see also</u> (Document No. 37-2, p.46). Judy reported to the Bureau of Prisons on or about February 13, 2012. (Document No. 23, p.14).

Schacht filed a "Motion To Dismiss" (Document No. 7) in this action on February 24, 2012; however, that motion was subsequently mooted by Plaintiff's "First Amended Complaint" (Document No. 8) filed on March 9, 2012. The "First Amended Complaint" only included a claim for conversion, and/or in the alternative, a claim for conversion and trover. (Document No. 8). Defendant's "Answer To Amended Complaint And Counterclaim" (Document No. 10) was filed on March 23, 2012. "Judy's Answer To Schacht's Counterclaim" (Document No. 11) was then filed on March 30, 2012).

In addition to Judy's criminal conviction in federal court, a civil "Judgment" (Document No. 35-1, pp.10-13) was entered against her in the Circuit Court of Pulaski County, Arkansas, 3rd Division, on April 12, 2012. In that case, CUMIS Insurance Society, Inc. ("CUMIS") obtained a judgment against Judy for $507,555.78, plus accruing interest and attorney's fees. (Document No. 35-1, p.13). The Credit Union had made its defrauded customer whole by paying him $510,055.78, and CUMIS as the Credit Union's insurer was then required to reimburse the Credit Union for $507.555.78. (Document No. 35-1, p.11). The Circuit Court of Pulaski County granted CUMIS's summary judgment motion in the state court action after determining that Judy was liable for conversion and fraud, and that CUMIS stood in the shoes of the Credit Union's defrauded customer. (Document No. 35-1, pp.10-13).

On May 21, 2012, the parties in this case filed a "Joint Motion To Stay Initial Attorneys Conference" (Document No. 12), seeking to stay the required Certification of Initial Attorney's Conference ("CIAC") until at least June 22, 2012. <u>See</u> Local Rule 16.1. The next day, the Court granted the "Joint Motion…" (Document No. 12), and ordered the parties to file their CIAC **on**

**or before June 22, 2012**.   Inexplicably, the parties' "Certification And Report Of Fed.R.Civ.P.26(f) Conference And Discovery Plan" (Document No. 14) was filed **August 5, 2013**, more than thirteen (13) months late.

A "Joint Stipulation of Consent to Exercise Jurisdiction by a United States Magistrate Judge" (Document No. 15) was filed on August 7, 2013;  and on August 8, 2013, this case was reassigned to the undersigned Magistrate Judge to "conduct any and all proceedings in the case." (Document No. 15).  Also on August 8, 2013, the undersigned issued a "Pretrial Order And Case Management Plan" (Document No. 16).  The "Pretrial Order And Case Management Plan" set the following case deadlines:  discovery –February 15, 2014;  mediation – March 1, 2014; motions – April 1, 2014;  and trial – August 11, 2014.  (Document No. 16).

Between August 2013 and March 2014, there appears to have been little, if any, activity in this case.  Then on March 31, 2014, Plaintiff, without seeking leave of Court or providing the opposing party's written consent, filed the "Second Amended Complaint By Joyce Judy" (Document No. 23).  See Fed.R.Civ.P. 15(a)(2).  The Second Amended Complaint added for the first time claims for breach of fiduciary duty, constructive fraud, and unfair and deceptive trade practices.  (Document No. 23).

After the parties failed to file a timely report on the results of mediation, the undersigned ordered the parties to file a Mediation Report and Status Report, on or before April 10, 2014. (Document No. 16;  Document No. 20).  The parties' reports indicated that mediation had failed and that the parties had agreed to taking depositions in May 2014, even though the discovery and motions deadlines had passed.  (Document Nos. 21 and 22).

Defendant Schacht filed his "Answer To Second Amended Complaint And Counterclaim" (Document No. 24) on May 12, 2014.  Schacht did not file any specific objection

to the untimeliness of the "Second Amended Complaint By Joyce Judy" (Document No. 23). Moreover, Judy failed to file any response to Schacht's "Answer To Second Amended Complaint And Counterclaim" (Document No. 24).

With no apparent discovery disputes, and no motions practice, by July 2014 this matter appeared to be ripe for trial. As such, the undersigned ordered that a Final Pretrial Conference be held on September 4, 2014, in preparation for a trial beginning on or about September 15, 2014. (Document No. 25). During the Final Pretrial Conference/Status Conference on September 4, 2014, it quickly became clear that this matter was not yet ready for a jury trial. (Document No. 34). Based on the record, and the requests of counsel, the undersigned agreed to re-open the opportunity to file dispositive motions. Id.

On September 25, 2014, the parties timely filed the now pending: "Motion For Partial Summary Judgment On Part Of Her Claim For Conversion By Joyce Judy" (Document No. 35); Defendant's "Motion For Summary Judgment And Partial Summary Judgment" (Document No. 37); and the "Motion For Partial Summary Judgment On Schacht's Defenses Of Illegality And Lack Of Consideration By Joyce Judy" (Document No. 40). As of October 24, 2014, these motions were fully briefed and are now ripe for review and disposition.

## II.    STANDARD OF REVIEW

The standard of review here is familiar. Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted). Only disputes between the parties over material facts (determined by reference to the substantive law) that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id.

Once the movant's initial burden is met, the burden shifts to the nonmoving party. Webb v. K.R. Drenth Trucking, Inc., 780 F.Supp.2d 409 (W.D.N.C. 2011). The nonmoving party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248. In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. At summary judgment, it is inappropriate for a court to weigh evidence or make credibility determinations. Id. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

When considering cross-motions for summary judgment, a court evaluates each motion separately on its own merits using the standard set forth above. See Rossignol v. Voorhaar, 316 F.3d 516, 522 (4th Cir. 2003); accord Local 2-1971 of Pace Int'l Union v. Cooper, 364 F.Supp.2d 546, 554 (W.D.N.C. 2005).

## III. DISCUSSION

**A. Defendant's Motion For Summary Judgment**

Defendant Schacht seeks summary judgment dismissing all of Plaintiff's claims, and partial summary judgment on his counterclaims, leaving the issue of damages for a jury trial. (Document No. 37).

First, Schacht argues that Judy cannot bring her claims for conversion, unfair and deceptive trade practices ("UDTP") or breach of fiduciary duty "because this case is essentially a contract interpretation case." (Document No. 37-1, p.6). Schacht further argues that all of Judy's tort claims fail "because she cannot prove lawful possession, deprivation, demand, or proximate cause." (Document No. 37-1, p.10).

Schacht then argues that Judy cannot succeed on a breach of contract claim because any contract is void for lack of consideration, illegality, and fraud. (Document No. 37-1, p.7). As Schacht notes, Judy did not file a claim for breach of contract. Id. The undersigned will decline to consider a motion for summary judgment by Schacht seeking to dismiss a claim Judy did not bring.

1.  Conversion

Next, Schacht argues that Judy is unable to prove the elements of conversion. (Document No. 37-1, pp.10-12). "To prove conversion, Judy must show: (1) the unauthorized assumption and exercise of the right of ownership over goods dollars (2) belonging to another, and either (3) the alteration of their condition or the exclusion of the owner's rights." (Document No. 37-1, p.10) (citing Wall v. Colvard, Inc., 268 N.C. 43 (1966)); see also, Variety Wholesalers, Inc. v. Salem Logistics Traffic Services, LLC, 365 N.C. 520, 523 (2012) ("two essential elements of conversion claim: ownership in plaintiff and wrongful possession or conversion by the defendant.").

Schacht persuasively argues that Judy cannot prove that she was the lawful owner of the entire one million dollars, especially since she admits $500,000 was obtained by fraud, and at least $225,000 came from someone else. (Document No. 37-1, p.11) (citing Document No. 37-2, p.14). Schacht further argues that Judy cannot prove Schacht had no interest in the funds because months after the wire transfer Judy still believed that she and Schacht had rights to the funds and that any lawsuit to recover the funds would be in Schacht's name. <u>Id.</u> (citing Document No. 37-2, p.40). Schacht also notes that the funds in question were transferred from Schacht and Judy's *joint* account. (Document No. 37-1, pp.11-12).

In addition, Schacht contends that even if he waived any of his rights with regard to the joint account by the October 29, 2009 agreement not to "withdraw" funds, Plaintiff cannot prove she did not give permission for him to transfer the funds. <u>Id.</u> Walker and Schacht both testified that they received permission to transfer the funds, and Judy's only evidence of comments on the wire transfer is an email stating that she hoped the funds got to Mousely quickly. (Document No. 37-1, p.12) (citing Document No. 37-4, p.16; Document No. 43-1, pp.42-43); <u>see also</u> (Document No. 37-2, pp.31-32). Even if the funds were transferred without permission, Schacht contends they were not converted to his personal use. <u>Id.</u>

Finally, Schacht observes that Judy continued to believe she would get her principal back, and that any harm she suffered was based on the acts of Mousely and/or others. <u>Id.</u> (citing Document No. 37-2, p.25).

Plaintiff's argument in her "Response In Opposition…" consists of one sentence without any specific citation to evidence or legal authority:

> For her conversion claim, Judy offers proof of her possession of $1,000,000 by her having wired it into the parties' joint account at Bank of America (and she adopts by this reference her arguments

in support of her motion for partial summary judgment as to
money she admits having obtained from a third party by fraud);
her agreements with Schacht that the money will remain in the
account; Schacht's wire instructions; Schacht's putting the money
in only his name; Schacht's subsequent instructions to return the
money into an account in only his name; and damages.

(Document No. 43, p.7).

Plaintiff Judy's response is not persuasive.   More importantly, it fails to satisfy her
burden to "set forth specific facts showing there is a genuine issue for trial."   See Anderson, 477
U.S. at 248.  The undersigned will briefly address Judy's contentions.

First she states that she has offered "proof of her possession of $1,000,000 by having
wired it into the parties' joint account."  (Document No. 43, p.7).  The parties agree, however,
that the first element of a conversion claim is "ownership in the plaintiff," not "possession by the
plaintiff."   At most, Plaintiff had an ownership interest in $500,000, which she then willingly
deposited in an account opened by, and shared jointly with, Defendant Schacht.

Judy also cites "her agreements with Schacht that the money will remain in the account."
Id.  Judy has only identified one agreement regarding money in the joint account, and even if the
Court construes that agreement as valid (even though it is premised on a false representation that
the Credit Union is partially responsible for the deposit), it clearly states that Schacht
"acknowledge[s] the initial deposit is not my funds to withdraw."  (Document No. 43-3).  There
is no dispute that Schacht moved the funds by directing a wire transfer, not a withdrawal.  Judy,
an experienced banker, could have stipulated that "the money will remain in the account" and/or
that "the money will not be transferred," but that is not the language in the agreement she
submitted to Schacht.  (Document No. 43-3).  As noted above, Judy did tell Schacht there was an

"administrative hold," even though she later testified that such a hold was not possible. (Document No. 37-2, p.44).

The undersigned notes that <u>Variety</u> defines conversion as "'an unauthorized assumption and exercise of the right of ownership,'" but here, Judy clearly admits she deposited the funds into a joint account with Schacht. <u>Variety</u>, 365 N.C. at 523 (quoting <u>Peed v. Burleson's, Inc.</u>, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956)). "The ownership of funds in a bank account is presumed to belong to or be owned by the person(s) named on the account. <u>Mutual Community Savings Bank, S.S.B. v. Boyd</u>, 125 N.C.App. 118, 122 (1997) (citing <u>Banks & Banking</u> § 280 (1996); <u>Smith v. Smith</u>, 255 N.C. 152, 154, (1961)). Moreover, the record before the Court establishes that the purpose of Judy and Schacht's joint venture or partnership was to allow Schacht to control, or at least "facilitate," use of the parties' funds for a "private placement trading platform" and/or other investment(s) directed by Mousely. <u>See</u> (Document Nos. 43-2, 43-5). Judy's deposit into the joint account is consistent with the parties' testimony and the underlying "Joint Venture Agreement."

Even if Schacht and Walker both mistakenly assert that Judy explicitly approved the transfer of the funds on or before November 18, 2009, the undersigned finds that undisputed evidence shows that Judy ratified the wire transfer by Friday November 20, 2009 – probably before the transfer had even been completed. (Document No. 37-2, pp.31-32). As discussed above, the evidence is that by 11:09 a.m. on November 20, 2009, Judy was not only aware of the transfer but had decided, **and expressed in an email to Schacht**, that **she hoped the transfer went through** by the following Wednesday. <u>Id.</u>; (Document No. 43-4, p.90). According to the unrebutted testimony of Walker, by 4:00 on Friday November 20, 2009, Bank of America still

"hadn't sent the money" and "[s]o Bob raised all kind of hell with the bank." (Document No. 37-4, p.16).

Judy's assertions that Schacht put the money in his name only and provided subsequent instructions to return the money into an account in his name lack any citation to the record or legal authority, and provide little, if any, support for the conversion claim. (Document No. 43, p.7). In contrast, Schacht re-asserts in his "Reply Brief…" that he and Judy had an interest in the funds after the wire transfer and continued to pursue them together. (Document No. 46, p.5). Schacht notes that "[t]here is no conversion until there is an act denying or violating the plaintiff's dominion over or rights in the property," and then concludes that there was no deprivation of rights until Mousely lost the funds and so "Mousely – not Schacht – was the proximate cause of Judy's deprivation of rights." Id. (citing Gallimore v. Sink, 27 N.C.App. 65, 67 (1975).

In short, the undersigned finds that Plaintiff has not identified evidence to support the elements of a claim for conversion. At most, Plaintiff had "ownership" of $500,000.00 of the funds deposited in the joint Schacht/Judy account. In addition, Plaintiff Judy has not adequately shown that Schacht wrongfully possessed or converted the funds in the joint bank account. Even accepting as true that Judy did not expressly grant her permission to wire transfer $1,000,000.00, the undersigned does not find that there is sufficient evidence for a reasonable jury to conclude that Defendant Schacht is liable for conversion.

Notably, Judy's underlying acts defrauding her Credit Union customer provide a clear example of conversion. There, the customer had undisputed ownership of his $500,000.00, Judy lied about an investment in a CD, and then Judy wrongfully converted the money for her own use and investment interests. (Document No. 35-1).

Viewing the record as a whole, as discussed in detail above, and in the light most favorable to Plaintiff, the undersigned is not convinced that Judy has shown there is a genuine issue of material fact for trial regarding this claim.  See Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.").  Based on the foregoing, the Court will grant summary judgment to Defendant on Plaintiff's claim for conversion.

2. Trover

In the alternative to her conversion claim, Judy asserts that Defendant Schacht "wrongfully converted, certain property **owned by Ms. Judy**;  that property consisting of $500,000 cash in **Ms. Judy's Bank of America checking account**" by a wire transfer. (Document No. 23, p.6) (emphasis added).  Judy contends she "had a superior right of possession to the $500,000, and Mr. Schacht committed the common law tort of trover when he wired the funds from the account."  (Document No. 23, pp.6-7).

In seeking summary judgment, Schacht contends that Judy cannot maintain an action for trover, because she is not the true owner of the $500,000 in question, and the true owner (the defrauded Credit Union member) is known.  (Document No. 37-1, p.13) (citing Russell v. Hill, 125 N.C. 470 (1899);  Barwick v. Barwick, 33 N.C. 80 (1850);  Vinson v. Knight, 137 N.C. 408 (1905)).

> [I]f it appears on the trial, that the plaintiff, although in possession, is not in fact the owner, and that the property belongs to a third person, the presumption of title, inferred from the possession, is rebutted: and it would be manifestly wrong to allow the plaintiff to recover the value of the property.  For the real owner may forthwith bring trover against the defendant, and force *him* to pay

> the value a second time, and the fact that he had paid it in a former
> suit would be no defence.

Barwick, 33 N.C. 80, 1850 WL 1259, at *2 (1850).

Schacht concludes that Judy cannot show she had title to the half million dollars, and cannot show he converted any of the funds to his own use. (Document No. 37-1, p.14). Schacht also notes that despite Judy's arguments, CUMIS may yet be knocking on the door for the same amount and that Judy should not be allowed to profit from her wrongdoing. Id.

Plaintiff's "Response In Opposition…" fails to rebut Defendant's arguments and authority, or even to address her claim for trover. (Document No. 43); see also, (Document No. 36). As such, it appears that Plaintiff Judy has abandoned her claim for trover, and that Defendant Schacht is entitled to summary judgment on that claim. See (Document No. 46, p.6) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (a party opposing a properly supported motion for summary judgment "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'").

3. Fiduciary Duty

The Amended Complaint also asserts a claim for breach of fiduciary duty. (Document No. 23, p.7). Judy contends that she and Schacht were in a fiduciary relationship by virtue of their partnership, and that Schacht breached his fiduciary duty by "his self-dealing and other actions and inactions." Id.

In his motion for summary judgment, Schacht argues that: (1) "[a]claim for fiduciary duty is misplaced in a purely contractual case"; and (2) Judy's claims require a special relationship that she is unable to show. (Document No. 37-1, p.15). "Only when a party figuratively holds all the cards – all the financial power or technical information, for example –

have North Carolina Courts found that the special circumstance of a fiduciary relationship has arisen." (Document No. 37-1, pp.15-16) (citing <u>Broussard</u>, 155 F.3d at 348). Schacht contends that he "cannot be ascribed fiduciary status … [a]t most he was an equal partner with Judy." (Document No. 37-1, p.16). Schacht further asserts that even if he violated a fiduciary duty, Judy cannot show any breach of duty that proximately caused her harm. (Document No. 37-1, p.18). Rather, "[e]ven if Schacht's transfer began a series of events that led to her harm, the superseding proximate cause of her harm was the negligence or criminal activity of" Mousely and others. <u>Id.</u>

Judy notes in her "Response…" that there is no real dispute that the parties to this litigation were in a partnership, and that business partners are each other's fiduciaries as a matter of law. (Document No. 43, p.7) (citing <u>Casey v. Grantham</u>, 239 N.C. 121 (1954). Next, Judy asserts that "Schacht's conversion alone represents a breach of his fiduciary duty." (Document No. 43, p.8). In addition, Judy asserts that Schacht: (1) broke his promise not to withdraw the money; (2) arranged for trading profits to be funneled exclusively to him; (3) subsequently convinced Judy to give $100,000 more to a new acquaintance; and (4) withheld from Judy his own complete lack of understanding of the transactions or the risks they carried. <u>Id.</u>

The undersigned observes that "[t]o establish a breach of fiduciary duty, a plaintiff must show the existence of a fiduciary duty, and a breach of that duty." <u>Team 7, LLC v. Protective Solutions, Inc.</u>, 759 F.Supp.2d 698, 704 (E.D.N.C. 2010) (citing <u>Keener Lumber Co. v. Perry</u>, 149 N.C.App. 19, 28 (2002) <u>disc. review denied</u>, 356 N.C. 164 (2002)). Plaintiff appears to correctly assert that Judy and Schacht owed each other a fiduciary duty based on their partnership:

> Whether such a relationship exists is generally a question of fact for the jury. <u>Stamm v. Salomon</u>, 144 N.C.App. 672, 680, 551 S.E.2d 152, 158 (2001), <u>disc. review denied</u>, appeal dismissed, 355 N.C. 216, 560 S.E.2d 139 (2002). As a matter of law, however, business partners are fiduciaries to one another. <u>HAJMM Co.</u>, 328 N.C. at 588, 403 S.E.2d at 489. In our analysis, we agree with plaintiffs that whatever the undefined business relationship was between the parties, it created a fiduciary relationship, primarily because it is undisputed that [Plaintiff] deposited funds with [Defendant] for the purchase of real estate, which would clearly support a finding that plaintiffs placed special confidence in [Defendant].

<u>Carcano v. JBSS, LLC</u>, 200 N.C.App. 162, 178 (2009).

Although the undersigned is persuaded that there was, as a matter of law, a fiduciary relationship here, the Court is not convinced that Plaintiff has adequately shown a breach. <u>Trana Discovery, Inc. v. Southern Research Inst.</u>, 2014 WL 5460611, at *6 (E.D.N.C. 2014) (quoting <u>Rhone-Poulenc Agro S.A. v. Monsanto</u>, 73 F.Supp.2d 540, 547 (M.D.N.C. 1999) ("a fiduciary relationship exists between members of a joint venture, as a matter of law."). As noted above, Plaintiff relies on the alleged "conversion alone" as evidence of a breach. However, the Court has determined that Plaintiff's conversion claim fails. Plaintiff then cites several additional factual allegations as evidence of a breach. These unsupported assertions also fail.

First, the Court has already determined that Schacht did not "withdraw" the money, and that even if his transfer was not explicitly approved in advance, it was subsequently ratified by Judy. Next, Plaintiff has failed to provide sufficient evidence that even if there were any profits, they would be "funneled exclusively" to Schacht. (Document No. 43, p.8). The suggestion that Schacht later convinced Judy to give $100,000 appears to be a new claim without any citation to the record or other support. <u>Id.</u> Moreover, it is unclear (and unexplained) how Schacht breached a duty to Judy when she gave $100,000 to someone else. <u>Id.</u>

Finally, the Court is not persuaded that Schacht's alleged "lack of understanding of the transactions" is evidence of breach. Id. Judy does not cite any specific evidence that Schacht misrepresented his knowledge of the proposed transaction(s). Rather, it appears undisputed that he accurately portrayed himself as a race car driver and someone who helped train other drivers. In fact, the Amended Complaint describes Schacht as having "years of experience in the racing industry" and that he "would bring to the deal his industry knowledge, experience, and relationships." (Document No. 23, p.1). The Complaint does not allege that Schacht would bring, or claimed to have, knowledge of currency trading or investing. (Document No. 23). Judy, on the other hand, entered the partnership with years of experience in banking and investing funds, and also falsely representing to Schacht that she had the approval and financial backing of the Credit Union for their transaction(s).

In short, the undersigned finds that Plaintiff Judy has not established a genuine issue of material fact as to her claim for breach of fiduciary duty. Essentially, Judy's inability to adequately plead facts to support her claim for conversion also leads to the conclusion that there was no breach. Judy has not identified evidence of Schacht's alleged "self-dealing and other actions and inactions" to support her claim. The Court will, therefore, grant Defendant's motion as to Judy's claim for breach of fiduciary duty.

4. Constructive Fraud

Defendant Schacht also seeks judgment regarding Plaintiff's claim for constructive fraud.

"The elements of a claim of constructive fraud require: '(1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured.'" Trantham v. Michael L. Martin, Inc., 745 S.E.2d 327, 332 (2013) (citing White v. Consol. Planning, Inc., 166 N.C.App. 283, 294

(2004));  see also, Carcano v. JBSS, LLC, 200 N.C.App. 162, 178 (2009) (citing Barger v. McCoy Hillard & Parks, 346 N.C 650, 668 (1997) ("constructive fraud requires more than a fiduciary relationship.").

The undersigned finds that Plaintiff has failed to show specific facts creating a triable issue that Defendant participated in the underlying transaction for his own benefit – rather, the evidence of record discussed above shows that the Judy-Schacht partnership invested in a transaction that benefitted neither party.  See Carcano, 200 N.C.App. at 178.  Specifically, Plaintiff Judy has not alleged in the Amended Complaint, or shown in her "Response…" or elsewhere, that Defendant Schacht was taking advantage of his position in order to benefit himself.  See (Document Nos. 23;  Document No. 43).

Also, Judy asserts that a "key feature of constructive fraud is that one partner occupies a superior position."  (Document No. 43, p.9) (citing Bogovich v. Embassy Club, 211 N.C. App. 1 (2011).  However, the undersigned does not find that the record identifies evidence by which a reasonable jury would conclude that Schacht's position was superior to Judy's.  The record instead shows that the parties entered a joint venture, that they opened a joint account, and that Judy provided the funds for the venture.  See (Document Nos. 43-2;  43-3;  and 43-5).  The record also suggests that Judy's allegations regarding negotiations or communications regarding the Iowa race track and/or the trader Mousely would be more accurately asserted against non-party Walker than Schacht.

Based on the foregoing, the Court will grant Defendant's motion for summary judgment as to Plaintiff's constructive fraud claim.

5.  Unfair and Deceptive Trade Practices

In her final claim, Judy asserts that Schacht is liable for UDTP based on his "self-dealing and other actions and inaction" and his "inequitable assertion of power." (Document No. 23, p.8). By the instant motion, Schacht argues that the UDTP claim should be dismissed, and he should recover an award of attorneys' fees. (Document No. 37-1, p.23).

To prevail on a UDTP claim, a plaintiff must prove: (1) that defendant engaged in conduct that was in or affecting commerce; (2) that the conduct was unfair or had the capacity or tendency to deceive; and (3) that plaintiff suffered actual injury as a proximate result of defendant's actions. South Atlantic Ltd Partnership of Tennessee v. Riese, 284 F.3d 518, 535 (4th Cir. 2002).

> As Judge Ervin noted in Gilbane, in assessing whether particular conduct violates the UTPA, "[e]ither unfairness or deception can bring conduct within the purview of the statute; an act need not be both unfair and deceptive." Id. at 903 (citing Rucker v. Huffman, 99 N.C.App. 137, 392 S.E.2d 419, 421 (1990)). And while there is no doubt that the North Carolina courts have construed the UTPA liberally, there are some limits on its application. Id. For example, **only practices that involve "[s]ome type of egregious or aggravating circumstances"** are sufficient to violate the UTPA. Dalton v. Camp, 353 N.C. 647, 548 S.E.2d 704, 711 (2001).
>
> As a general rule, **a practice is considered "unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."** Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397, 403 (1981).

Id. (Emphasis added).

Consistent with the discussion above, the undersigned remains unconvinced that Plaintiff Judy has shown sufficient facts to support her allegations that Schacht engaged in self-dealing or an inequitable assertion of power. Moreover, she does not allege, or identify specific facts,

showing "egregious or aggravating circumstances," or practices by Schacht that are "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Id.

Notably, Plaintiff's "Response…" relies heavily on the scheme to create the false impression that Schacht had $5,000,000 on deposit in the Credit Union to support her UDTP claim. (Document No. 43, pp.10-12). However, as noted by Defendant, "Judy is the one who admits she falsified the document purporting to have $5,000,000.00 with her own Credit Union." (Document No. 46, p.11); see also (Document No. 43-5). Schacht persuasively asserts that, at best, Judy has shown that she and Schacht conspired to commit fraud against Mousely by creating fake paperwork. Id. The undersigned agrees that these facts, even viewed in the light most favorable to Judy, do not support a claim of UDTP by Judy against Schacht. If anything, the facts surrounding the purported $5 million scheme tend to incriminate Judy for "unfair and deceptive" practices. Plaintiff Judy fails to explain how she suffered actual injury as a proximate result of the parties' conspiracy to create the false impression that Schacht had $5,000,000.00 in a Credit Union account.

The Court will thus also grant summary judgment for Defendant regarding Plaintiff's UDTP claim. As discussed above, the undersigned has determined that Plaintiff has not identified or forecast sufficient facts to support any of her claims. The crux of all of Plaintiff's claims is that Defendant wrongfully transferred funds from the parties' joint account. As discussed in greater detail above, the Court finds that the record clearly supports Defendant's position that even if Plaintiff did not explicitly grant permission for the transfer, her actions soon thereafter and for many months following, ratified that transaction. Moreover, Defendant has persuasively argued with all of the claims that Plaintiff has not adequately shown that he was the proximate cause of any damages she suffered. The record does not include facts showing that

Schacht, "unbroken by any new and independent cause," was the cause of Plaintiff's damages. Town of Nags Head v. Toloczko, 2014 WL 4219516, at *17 (E.D.N.C. 2014).

**B. Defendant's Motion For Partial Summary Judgment**

Defendant Schacht also seeks "partial summary judgment" as to his counterclaims. (Document No. 37). Specifically, Schacht asserts that the Court should grant his claims for breach of contract, fraud, and constructive fraud, but allow a jury to determine his damages. (Document No. 37-1, pp.20-23). Both parties' briefing on Defendant's claims for partial summary judgment is, at best, conclusory.

In addition, Defendant's briefing, along with other testimony and evidence, appears to show that the parties' partnership was, at least initially, based on their joint fraudulent scheme. The Court observes that in the same "Brief In Support…" that Defendant seeks at least partial summary judgment for his counterclaims, he also argues that the parties "**are *in pari delicto* and should be left where they stand.**" (Document No. 37-1, p.14) (emphasis added). The *in pari delicto* doctrine "deals generally with parties whose equal, mutual, and simultaneous fault casts them in the role of joint conspirators." Lawler v. Gilliam, 569 F.2d 1283, 1292 (4th Cir. 1978). "At best their entire relationship was founded on the illegal conduct and misrepresentations of Judy." (Document No. 37-1, p.14). Defendant contends that "all of the transactions here are 'fruit of the poisonous tree.'" (Document No. 37-1, p.15).

Defendant Schacht later acknowledges in his "Reply Brief…" that viewing the facts in the light most favorable to Plaintiff, she has

> shown that **she and Schacht conspired to commit fraud against Mousely by creating fake paperwork**. As argued in further detail in Defendant's original Brief In Support of Motion For Summary Judgment, this gets Judy as far as being *in pari delicto* with Schacht and unable to collect from their conspiracy.

(Document No. 46, p.11) (emphasis added).

Despite Defendant's apparent admission, the undersigned will briefly address his claims.

1. Fraud

First, Defendant succinctly identifies the elements of a fraud claim, and notes that Judy has admitted she fraudulently obtained half the funds for the joint account and lied to protect her interests. (Document No. 37-1, p.21). Defendant then vaguely suggests that Judy's actions caused him damage because he thought "the race track purchase was 'going far,'" and according to his own observations the race track "seems to be doing well." Id.

Plaintiff's "Response In Opposition…" offers the following rebuttal for *all* of Defendant's arguments for partial summary judgment:

> Ignoring the speculative and insubstantial quality of these damages, Schacht has no claim because there is no causal relationship between Schacht's loss of the purchase of the racetrack and Judy's failure to disclose that she obtained half the money by an act of fraud against a third party. Schacht not only fails to make a case for such a causal relationship in the first place, he concedes the fact that the currency-trading transaction that was to be the source of the racetrack's purchase price failed by its own terms before anyone ever knew Judy had defrauded the third party. (Ex. A, Schacht 83:17-19)

> The essential point of failure common to all of Schacht's claims is the lack of a causal relationship between any of Judy's misrepresentations and any harm suffered by Schacht.

(Document No. 43, p.14) (citing Document No. 43-1, p.83). In the portion of Schacht's deposition referenced above by Judy, he affirms that the parties' deal failed because $50 million dollars did not come into the parties' (or his) hands in 2010, and that the deal failed before anyone was aware Judy had stolen money. (Document No. 43-1, p.83).

In his "Reply Brief…" Defendant asserts that he "thoroughly covered" his proof of damages and causation in his original brief. (Document No. 46, p.17). Assuming Defendant is referring to his original "Brief In Support Of Motion For Summary Judgment And Partial Summary Judgment" (Document No. 37-1), the undersigned respectfully disagrees. <u>See</u> (Document No. 37-1, pp.21-23). Defendant's "original brief" lacks any proof of damages, and little, if any, discussion of causation. <u>Id.</u>

Defendant's "Reply Brief…" contends that "his business suffered harm because of being linked to Judy's name," and "Schacht suffered the lost business opportunity of the racetrack." (Document No. 46, p.18). Therefore, Schacht concludes he is entitled to partial summary judgment and the opportunity to present a jury with evidence of damages.

Defendant has failed to identify any specific evidence that would demonstrate an absence of a genuine issue of material fact regarding his fraud claim. In particular, Schacht does not offer any evidence of damages he suffered. <u>See</u> <u>Celotex Corp</u>., 477 U.S. at 323. While it is undisputed that the events underlying this lawsuit include fraudulent activity by Judy, Schacht must also show how he was damaged by such fraud to sustain his claim. To date, Defendant has offered little more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>see also</u> (Document No. 24; Document No. 37-1; Document No. 46). As such, it is unlikely Defendant has even stated a claim upon which relief may be granted. <u>See</u> Fed.R.Civ.P. 12(b)(6).

At best, Defendant is asking the Court to simply accept his contention that that there are damages, and that he will prove them at trial. (Document No. 46, p.18). Defendant has not adequately identified or forecast any evidence of damages. Without more, the undersigned will decline to summon a jury to hear Defendant speculate about damages he suffered based on a

failure to realize profits from a racetrack that was never purchased. See Roberts v. Onslow County Bd. of Educ., 2014 WL 5781613, at *6 (E.D.N.C. Nov. 6, 2014) ("any jury verdict for plaintiff would be based on speculation and conjecture."); Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quoting Ford Motor Co. v. McDavid, 259 F.2d 261,266 (4th Cir. 1958) ("it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests upon mere speculation and conjecture.").

Just as Judy's claims lack evidence that Schacht was the proximate cause of her harm, so too do Schacht's claims fail. By his own admission, the parties' deal failed long before Judy's fraud was known. (Document No. 43-1, p.83). Moreover, Schacht is asking the Court to assume that but for Judy's fraud, he would have raised sufficient funds to purchase the Iowa track, and that he would have subsequently profited from that purchase. However, in three (3) years of litigation he has failed to produce any evidence of such contention. As such, Defendant has failed to adequately support the damage element of his claim. It is more likely that Defendant's damages, if any, are a result of his own decisions and/or the intervening acts of Mousely and others.

Schacht seems to ignore that he might have any culpability regarding the underlying venture with Judy, Walker, and Mousely. In his counterclaim, Defendant contends that he "would never have agreed to put his name on a joint account or enter into the parol partnership agreement with Plaintiff had he known that the funds in the account were obtained by fraud." (Document No. 24, pp.13-14). Such a statement is unpersuasive since the evidence shows that the parties' venture was initially founded on a joint attempt to represent to Mousely that Schacht and/or Chapin Motorsports, LLC, owned a Credit Union account with $5 million dollars. See (Document Nos. 43-2, 43-5). As noted above, Schacht testified to the following:

> A.  The - - see, the money that was in the – the money that was in the Arkansas Federal Credit Union, that account there - - I don't know what's the word that was used, maybe doctored up paper to make it look like there was money in an account.
>
> I mean, there was no money in the account.  It was an account with my name on it, but she controlled the paper on it – Joyce.

(Document No. 43-1, pp.38); <u>see also</u> (Document No. 46, p.11) ("she and Schacht conspired to commit fraud against Mousely by creating fake paperwork.").  Schacht is also the one who hit the "send" button as to $1 million dollars to an overseas account for a purported investment, and investor, he knew little about.  His speculative damages largely rest with on his own decision, regardless of the advice or consent of others, to transfer those funds.

Based on the foregoing, the Court is not satisfied that Defendant has adequately shown that there is no genuine issue of material fact as to his counterclaim for fraud.  Instead, the undersigned finds that Defendant has failed to state enough facts to support a plausible claim.  <u>See</u> <u>Iqbal</u>, 556 U.S. at 697.

### 2.  <u>Constructive Fraud</u>

Defendant's next argument for partial summary judgment provides the elements of the claim, but offers no elaboration or citation to evidence to support his claim.  (Document No. 37-1, pp.21-22).  Even accepting as true that Defendant has established the first two elements of a constructive fraud claim, he again fails to identify or forecast any evidence of damages.  <u>Id.</u>; <u>see also</u>, (Document No. 24, pp.14-15).  The Court again determines that Defendant's allegations of damage to his "business reputation" and "potential future earnings" are speculative, and not sufficient to put this claim before a jury.  (Document No. 23, p.15).  As such, Defendant's motion for partial summary judgment for constructive fraud will be denied.

3. Breach of Contract

Finally, Defendant contends that he should be granted partial summary judgment on his

breach of contract claim, allowing a jury to determine damages. (Document No. 37-1, p.23).

> In North Carolina, "[t]he elements of a claim for breach of
> contract are (1) existence of a valid contract and (2) breach of the
> terms of that contract." Poor v. Hill, 138 N.C.App. 19, 26, 530
> S.E.2d 838, 843 (2000).[] Furthermore, every contract carries an
> implied covenant of good faith and fair dealing that neither party
> will do anything which injures the right of the other to receive the
> benefits of the agreement. Bicycle Transit Auth., Inc. v. Bell, 314
> N.C. 219, 228, (1985).

Gandecha v. Metropolitan Property and Cas. Ins. Co., 2014 WL 4243797, at *3 (E.D.N.C. Aug.

26, 2014).

Defendant asserts that:

> Judy violated this covenant by providing half of the
> consideration from ill-gotten gains, misrepresenting the source of
> the other half of the consideration, misrepresenting in writing to
> Schacht and others that the funds were free and clear, and using
> Schacht to try to recoup her illegally obtained funds and then suing
> him without justification. The racetrack was never purchased and
> therefore both Judy and Schacht have been harmed by the fact that
> the profits from the racetrack were never realized.

(Document No. 37-1, p.23).

Notably, Defendant Schacht argues earlier in his brief that there can be no breach of

contract claim, even though Judy does not assert such a claim, because "any contract is void for

lack of consideration, illegality, and fraud." (Document No. 37-1, pp.7-10). Defendant does not

opine as to why a breach of contract claim is available to him, but not Judy, if there is not a

"valid contract." (Document No. 37-1, p.23). Defendant also declines to identify the terms of

the alleged contract. Id. Defendant asserts that "both Judy and Schacht have been harmed by the

fact that the profits from the racetrack were never realized." Id.

The undersigned observes that Defendant's claim for breach, focused solely on the implied covenant of good faith and fair dealing, is essentially the same as his previous claims for fraud —that he was wronged by Judy financing their venture with illegally obtained funds.

In addition to the ambiguity over whether a contract claim is viable here, the undersigned is particularly concerned that Defendant's claims all essentially seek recovery for Plaintiff's alleged breach of good faith and fair dealing, even though Defendant acknowledges that the partnership he alleges she breached was based on the parties' fraudulent conspiracy.  (Document No. 43-1, pp.38);  see also (Document No. 46, p.11).

As with his other claims, Defendant alleges that he suffered harm based on the alleged loss of profits on the potential racetrack enterprise.  (Document No. 24, p.13;  Document No. 37-1, p.23;  Document No. 46, p.18).  The undersigned concludes that even if Defendant were allowed to proceed with a breach of contract claim, he has not adequately identified or forecast any evidence to support his purely speculative damages.

Based on the foregoing, the Court will deny Defendant Schacht's claims for partial summary judgment.

**C**.  **Plaintiff's Summary Judgment Claims**

Because the Court will grant Defendant's claim for summary judgment on Plaintiff's claims – finding each of her claims must fail, it appears unnecessary to further address Plaintiff's "Motion For Partial Summary Judgment On Part Of Her Claim For Conversion…" (Document No. 35).  Moreover, the undersigned also finds Plaintiff's "Motion For Partial Summary Judgment On Schacht's Defenses…" (Document No. 40) to be mooted by the foregoing discussion and decisions.

# IV.   CONCLUSION

After careful consideration of the parties' arguments and the evidence, including affidavits, depositions, and stipulations, the undersigned is convinced that there is no genuine issue of material fact here for trial.  In short, this lawsuit springs from an unlikely partnership formed under an apparently fraudulent scheme, that ultimately led to an ill-advised and poorly executed investment.  Likewise, the instant litigation has been mishandled due to inadequate attention to the rules, deadlines, and most importantly, the strength of the parties' claims.

During the underlying events, both parties made grave errors in judgment, but the undersigned cannot find that either party has identified sufficient facts to support any of their claims against each other.  In particular, it has not been adequately demonstrated that either party was the proximate cause of damages to the other.  Arguably, they would not have gotten into this "mess" without each other, but they formed a partnership, proceeded together on shaky ethical ground, and then decided to invest $1 million dollars overseas as advised by Walker and/or Mousely.  The evidence of record indicates that the damages the parties have suffered were caused by a series of bad decisions they each made, and by individuals who are either unknown, or at least not named parties, in this action.  It appears that Defendant stated it best when he opined that the parties "should be left where they stand."  (Document No. 37-1, p.14).

**IT IS, THEREFORE, ORDERED** that the "Motion For Partial Summary Judgment On Part Of Her Claim For Conversion By Joyce Judy" (Document No. 35) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's "Motion For Summary Judgment And Partial Summary Judgment" (Document No. 37) is **GRANTED in part**, and **DENIED in part**, as described herein.

**IT IS FURTHER ORDERED** that the "Motion For Partial Summary Judgment On Schacht's Defenses Of Illegality And Lack Of Consideration By Joyce Judy" (Document No. 40) is **DENIED**.

**IT IS FURTHER ORDERED** that this action shall be dismissed and this case closed, without an award of costs or fees to either party.

**SO ORDERED**.

Signed: December 17, 2014

David C. Keesler
United States Magistrate Judge